# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Sep 13 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# CRIMINAL COVER SHEET

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | |
|---|---|
| **CASE NAME:** USA v. Rory Spencer Rickey | **CASE NUMBER:** 3:23-mj-71383 MAG     CR complaint |
| **Is This Case Under Seal?** | Yes ✔     No |
| **Total Number of Defendants:** | 1 ✔     2-7     8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes     No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔     OAK     SJ |
| **Is this a potential high-cost case?** | Yes     No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes     No ✔ |
| **Is this a RICO Act gang case?** | Yes     No ✔ |
| **Assigned AUSA (Lead Attorney):** Daniel Pastor | **Date Submitted:** 9/12/2023 |
| **Comments:** Criminal complaint against Rory Rickey for 21 USC 841(a)(1), (b)(1)(C) | |

Form CAND-CRIM-COVER (Rev. 11/16)

RESET FORM     SAVE PDF

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| RORY SPENCER RICKEY | ) | Case No. 3:23-mj-71383 MAG |
| | ) | |
| *Defendant(s)* | ) | |

FILED
Sep 13 2023
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __8/24/2023__ in the county of __San Mateo__ in the __Northern__ District of __California__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of Methamphetamine |
| | Maximum Penalties: 20 years in prison; $1 million fine; lifetime supervised release and minimum of 3 years supervised release; $100 special assessment. |

This criminal complaint is based on these facts:

See attached affidavit of DEA Special Agent Colin Hart

☑ Continued on the attached sheet.

/s/ Colin Hart
*Complainant's signature*

Colin Hart, DEA Special Agent
*Printed name and title*

Approved as to form  _/s/ Daniel Pastor_
                AUSA  Daniel Pastor

Sworn to before me by telephone.

Date: 09/12/2023

*Judge's signature*

City and state: San Francisco, California    Hon. Peter H. Kang, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Colin Hart, a Special Agent (SA) with the Drug Enforcement Administration (DEA) being duly sworn, hereby declare as follows:

### INTRODUCTION

1. This Affidavit is made in support of three separate criminal complaints against **Matthew SESTAK, Frederick GAESTEL,** and **Rory RICKEY** for Distribution of a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) for their roles in a Door Dash-style drug delivery operation which distributes methamphetamine pills, cocaine, and other drugs throughout the San Francisco Bay Area. **SESTAK**, **GAESTEL**, and **RICKEY** appear to be working in concert, and as a result could be charged with drug conspiracy in violation of 21 U.S.C. §§ 846 and 841(a)(1). However, for purposes of charging at this stage, I propose charging each individual above only with a single count of methamphetamine distribution in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Because each individual's drug distribution occurred on a different date, I propose charging each defendant in his own complaint. The three complaints, all of which are supported by this single affidavit, are as follows:

   a) One count against **SESTAK** for distribution of methamphetamine on April 14, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C);

   b) One count against **GAESTEL** for distribution of methamphetamine on June 14, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and

2. One count against **RICKEY** for distribution of methamphetamine on August 24, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

3. The facts in this affidavit are based on my personal observations and knowledge, my training and experience, my review of reports prepared by other law enforcement officers and records prepared by others, information from records and databases, and information obtained from other government agents and witnesses. Because this affidavit is made for the limited purpose of showing probable cause for the requested arrest warrants, I have not set forth

1

every fact learned during the investigation; I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

4. Where actions, conversations, and statements of other individuals are referenced in this affidavit, they are described in sum and substance and in relevant part only, unless otherwise noted. Similarly, where information contained in reports, recordings, and/or other documents or records is referenced in this affidavit, such information is also described in sum and substance and in relevant part only, unless otherwise noted.

## AFFIANT BACKGROUND

5. I am a Special Agent ("SA") employed by the DEA and have been so employed since December 2019. I am currently assigned to the San Francisco Field Division. I am authorized and am presently assigned to investigate violations of the Controlled Substance Act ("CSA"), Title 21 of the United States Code, and other violations of federal law.

6. Prior to becoming a DEA Special Agent, I was a legal analyst with Verizon Wireless. In this capacity, I assessed and processed legal inquiries from various local, state, and federal law enforcement agencies. I also conducted cellular phone data extractions, real-time GEO tracking, and installed location-tracking programs to assist in Verizon Wireless's mission to complement the emergency services requests of various law enforcement agencies.

7. During my employment with the DEA, I have received nineteen weeks of full-time formalized education, training, and experience at the DEA Basic Agent Training Academy in Quantico, Virginia. This education, training, and experience included but was not limited to drug detection, drug interdiction, money laundering techniques, and schemes and investigation of individuals and organizations involving the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. As a Special Agent, I have participated in multiple narcotics investigations. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I have conducted complex dark web and cryptocurrency investigations. I also have participated in many aspects of drug

investigations including but not limited to telephone toll analysis, records research, and physical and electronic surveillance. I have participated in the execution of several federal search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics. In addition, I have attended a training course regarding drug smuggling and interdiction.

8. I have also had the opportunity to speak extensively with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures often employed by drug traffickers. I have examined documentation of various methods in which illicit drugs are smuggled, transported, and distributed. Throughout these investigations, I have also gained expertise in the use of a variety of law enforcement techniques, including the application and use of wire and electronic interceptions, confidential sources and undercover agents, surveillance techniques, and various other types of electronic techniques, such as body wires and transmitters. Additionally, I have gained knowledge and expertise in the use and analysis of data from pen register and trap-and-trace devices, toll records, traditional business records (including financial records and utility records) and nontraditional records kept by drug traffickers, such as pay-and-owe sheets documenting deliveries of and payments for narcotics. I have also gained knowledge and expertise in the collection and identification of drug evidence and the analysis and interpretation of taped conversations.

9. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

10. Through my work and training, I am familiar with how narcotics traffickers use

telephones, cellular telephone technology, pagers, coded communications, slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations. Based upon my training and experience, I know that it is common practice for narcotics traffickers to use pagers, telephones, and/or cellular telephones to communicate with their customers, suppliers, couriers, and other co-conspirators to insulate themselves from detection by law enforcement. It is common for them to initiate cellular phone service under the name of an associate or a fictitious name.

11. I have had many discussions with other experienced law enforcement officers and have conducted, and been present at, many interviews of self-admitted narcotics traffickers and cooperating defendants concerning how drug traffickers and money launderers operate. I know that drug traffickers often hold proceeds traceable to their drug-trafficking activities in the form of United States currency, funds in bank accounts, high-value personal property items, and real property. But I also know drug traffickers are now increasingly holding drug-trafficking proceeds in virtual currency or cryptocurrency.

12. Based on my training, research, education, and experience, I am familiar with the Dark Web and Cryptocurrencies. I know that cryptocurrencies are different from traditional currencies in that cryptocurrencies are not issued by or backed by any government. In addition, cryptocurrency accounts and wallets are different from traditional bank accounts in that these accounts are held in digital format in one of any number of various types of digital wallets or exchanges. Likewise, cryptocurrency is accessible only by the account holder or someone who has access to the account password or account "recovery seed," a mnemonic passphrase made up of a series of random words, or in some circumstances, by the company hosting the virtual wallet containing the cryptocurrency. Account holders can send and receive cryptocurrency using a unique and complex wallet address, often referred to as the private key.

13. Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or indirectly in a written

report. The officer providing me with the information may have received the information by way of personal knowledge or from another source. My understanding of certain events, facts, and evidence may change or develop as this investigation progresses.

## APPLICABLE LAW

14. Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person to knowingly possess with intent to distribute or to distribute a controlled substance. Methamphetamine and Adderall are Schedule II controlled substances.

## STATEMENT OF PROBABLE CAUSE

### Overview of Investigation

15. In March 2023 the Drug Enforcement Administration (DEA) identified a drug trafficking organization (DTO) operating out of East Palo Alto, California. The investigation has shown that the DTO's members include **Matthew SESTAK**, **Frederick GAESTEL**, **Rory RICKEY**, and others.

16. The DTO sells a variety of narcotics throughout the San Francisco Bay Area including methamphetamine pills, cocaine, and MDMA. The group uses the encrypted messaging app Signal to market and sell drugs.

### CS-1 Introduces DEA Undercover Agent (UC) to the DTO

17. In March 2023, a DEA Confidential Source (CS-1)[1] created a group chat on the Signal app between a DEA Undercover Agent ("UC"), CS-1, and "The Shop" to introduce the

---

[1] In March 2023, the DEA executed a federal search warrant at CS-1's residence. During the search, agents located evidence of narcotics trafficking. CS-1 agreed to work with the DEA on its investigation. CS-1 has not been charged with an offense at this time. A review of the CS-1's criminal history shows no other arrests and no criminal convictions. To date, agents have not known CS-1 to provide any information determined to be false or misleading. Agents are often able to corroborate CS-1's information through surveillance and other sources. Based on that corroboration, agents believe CS-1 is reliable.

UC to the DTO.

18. In the Signal chat, CS-1 introduced the UC to the group and explained that the UC wanted to order drugs and to be added to the "route."

### March 29, 2023: UC Buys Two Ounces of Cocaine and SESTAK Explains the Conspirators' Drug Distribution Business

19. After CS-1 introduced the UC to the "The Shop", the UC asked to order of "2 bs of dps and [eight-ball-emoji] of [snow-flake-emoji]."

20. I know from my experience with narcotics investigations that "2 bs of dps" is street slang for 2,000 Adderall pills pressed with the "dp" stamp that appears on prescription Adderall pills.

21. I also know from my training and experience that "bs" is street slang for two "boats" and that a "boat" is street slang for a quantity of 1,000 pills.

22. Based on my training and experience, I know that eight-ball emoji is commonly used to refer to 1/8th of an ounce of a drug (usually cocaine) and that the snow-flake emoji is commonly used in electronic communications to refer to cocaine.

23. The Shop responded: "Yeah so the route generally starts at 7pm to 11pm does that work for you."

24. The UC confirmed that the 7 PM to 11 PM delivery window would work and provided the Laurelwood Shopping Center at 1206 W Hillsdale Boulevard in San Mateo, CA as the UC's preferred meet address.

25. The Shop wrote: "So we try to hit you up with an exact eta about a stop or two away how long of a heads up do you need." The UC replied that he needed 30 minutes.

26. The Shop responded: "Awesome I'll add the note in for you and let you know delivery time frame as soon as i can I'm realizing you said San Mateo gotta see if that fits better with tonight's sf or tomorrow east bay let me check on that for you sorry I missed that earlier" / "It's labeled Wednesday I just wanna make sure so everyone is on the right page here" / "Okay

6

yeah tonight will fit I'm working on building the route now so I'll let you know a relative eta and then you'll get updated during the actual route."

27.     The Shop later messaged the UC that the drug delivery would occur around 7:30 PM on March 29, 2023

28.     The Shop then created a Signal chat on Signal between the UC, The Shop, and two additional screen names **"Soter"**, and "**Driver M**" (who agents later identified as drug courier **Matthew SESTAK**).

29.     The Shop wrote: "Hey friend! Our driver M will be delivering your order tonight and will be in your area in the 7:30-8:30pm range. He will let you know his eta when he is one stop away (usually about 10min). Please meet him at the car (silver Prius Prime) with exact change and either: - Hop in for a short "Uber" ride around the block - Get your order through the window like Door Dash."

30.     The Shop wrote: "Please keep money exchanges out of view of the window / Address: - 1206 w Hillsdale Blvd Total: $2200."

31.     The UC and **Driver M (SESTAK)** both confirmed the planned drug transaction in the Signal chat.

32.     On March 29, 2023, the UC met with **SESTAK** inside the drug courier's silver Prius Prime.

33.     **SESTAK** handed the UC a white paper bag which contained a white powdery substance which appeared to be cocaine in a clear plastic Ziploc bag.

34.     **SESTAK** then said that "we" have a full return policy.  If the UC did not sell all the cocaine, the UC could return or exchange what the UC did not sell.

35.     The UC asked **SESTAK** if his organization sold Adderall pills. **SESTAK** said they had Adderalls and had recently sold three "boats."

36.     **SESTAK** then asked if the UC had the "full menu." The UC said no and requested the menu.

37.     **SESTAK** said that he would have to confirm with "the girl who makes the call."

7

38. The UC then handed **SESTAK** the agreed purchase price of $2,200.

39. The UC asked if he should message the same group chat for future deliveries. **SESTAK** confirmed.

40. **SESTAK** then explained how the organization delivered drugs throughout the San Francisco Bay Area. **SESTAK** said "we" deliver to San Francisco and this side of the Bay on Wednesdays and to the North Bay and Oakland on Thursdays.

41. The suspected cocaine that the UC purchased from **SESTAK** was later tested at a DEA laboratory and determined to be Cocaine Hydrochloride with a net weight of approximately 56 grams and a pure cocaine weight of approximately 50 grams.

### April 14, 2023: UC Buys 2,000 Fake Adderall Pills from SESTAK

42. Shortly after the above-described cocaine transaction, the UC was added to a Signal group chat between the UC, The Shop, "Soter", and "Chronos".

43. On April 10, 2023, the UC sent a message to the Signal group asking to purchase 2,000 fake Adderall pills.

44. Soter responded on April 12, 2023: "Hey there, sorry can you remind us who connected you?"

45. The UC replied that he had purchased cocaine from the group.

46. Soter responded: "Yes sorry now I remember, just forgot to make a note in phone and we deal w a lot of ppl so always like to verify." The UC then asked for confirmation on the order of "2 bs", referring to two boats or 2,000 fake Adderall pills.

47. Soter responded on April 13, 2023: "Hey sorry got swarmed w messages and forgot to hit you back" / "Yes we can do that for ya, does tomorrow 11am-3pm range work?" / "work*" / "tonight's route is getting a little wild," / "and please lmk address".

48. The UC confirmed the deal and wrote: "Laurelwood shopping center, 1206 W Hillsdale Blvd, San Mateo, CA". The UC asked for the price of the fake Adderall pills.

49. On April 14, 2023, Soter messaged: "Hey sorry for the delay We can do 2k per so

4 total."

50.     The UC agreed to the price of $2,000 per boat for a total price of $4,000 in exchange for 2,000 fake Adderall pills.

51.     Later, on April 14, 2023, the UC met with **SESTAK** in the Laurelwood Shopping Center parking lot.

52.     **SESTAK** handed the UC a brown paper bag.

53.     The UC asked if it was okay to look at what was in the paper bag. The UC then opened the paper bag and saw two Ziploc bags containing suspected Adderall pills and a black mylar bag.

54.     As the UC took out the arranged $4,000, **SESTAK** advised the UC to place the money under the blanket in the trunk of his Prius. **SESTAK** then closed the trunk.[2]

55.     Laboratory testing of the suspected fake Adderall pills confirmed that they contained Methamphetamine and indicated a net methamphetamine weight of 670.7 grams and a pure methamphetamine weight of 24.1 grams.

### The DTO's Drug Menu and In-Person Delivery Process

56.     On April 26, 2023, the UC messaged on Signal asking for the new drug menu.

57.     Soter responded: "For sure," and sent a menu with a list of several different types of drugs and details about the DTO's "Ordering Protocol".

58.     Soter wrote: "And lmk what in particular if it's not on there" / "not sure if you ever deal w bulk things other than pills but we have great prices on molly and k right now."

59.     The menu stated: "WE'RE HIRING!" / "We need more delivery drivers".

60.     The menu section titled "Ordering Protocols" stated: "We have a $300 minimum order for postal shipments and Bay Area delivery" / "We only accept CASH or CRYPTO (if you don't already have crypto, we'll walk you through it)."

---

[2] CS-1 advised agents in August 2023 that she believed based on communication with the DTO that SESTAK was no longer working with the DTO.

61.     With respect to in-person delivery, the menu stated: "Delivery: Order by the night before relevant delivery day to receive your order" / "SF deliveries are WEDNESDAY night 8-11p" / "EAST BAY deliveries are THURSDAY night 8-11pm".

**June 14, 2023:  UC Purchases 1,000 Adderall Pills**

62.     On June 12, 2023, the UC sent another message to the Signal group requesting to purchase 1,000 Adderall pills.

63.     On June 13, 2023, Soter wrote: "Yes we can do that, $3K for the [iPhone-Boat-Emoji]" / "And you're still in San Mateo ish?"

64.     The UC confirmed that he was still located in San Mateo. The UC then requested that Soter lower the price for 1,000 Adderall pills closer to $2,000, closer to what the UC paid for the previous purchase of 2,000 Adderall pills.

65.     Soter responded: "most recent ones we bought were more expensive (been hard to find good sourcing)" / "Can we call it 2500? and if you get more in future we can drop to 2."

66.     The UC acknowledged, confirmed the price, and then asked if the deal would take place in San Mateo on June 14, 2023.

67.     Soter confirmed that "we're delivering in that direction tonight."

68.     Later that day, Soter wrote: "Hey Friend! Our Driver F will be delivering your order tonight in a black Honda Accord with Oregon plates and a cute black/white puppy - [] Laurelwood Shopping Center, 1206 West Hillsdale Blvd - [] $2500 - [] 7:40-8:30   He will let you know his eta when he is one stop away (usually about 10min)."

69.     Soter continued: "Please meet him at the car (black Honda Accord) with exact change and either:  - Hop in for a short "Uber" ride around the block  - Get your order through the window like Door Dash / Please keep money exchanges out of view of the window."

70.     That evening, the UC met with **GAESTEL** in a parking lot.

71.     The UC asked if **GAESTEL** was "F," and **GAESTEL** confirmed that he was.

72.     **GAESTEL** then handed the UC a brown paper bag with white-colored spots,

which contained a clear Ziploc bag containing orange pills with markings "b 974" and "30".

73. The UC then handed **GAESTEL** the agreed $2,500. The UC observed **GAESTEL** place the cash in a pocket.

74. Laboratory results for the suspected fake Adderall pills confirmed that they contained Methamphetamine and indicated a net weight of 385.0 grams and a pure methamphetamine weight of 19.2 grams.

75. Following the controlled buy from **GAESTEL**, agents followed **GAESTEL** for about 4.5 hours as he made suspected drug deliveries in San Francisco where he met multiple individuals and conducted hand-to-hand transactions while getting in and out of his vehicle.

### July 26, 2023: The UC Buys Fake Adderall Pills Containing Methamphetamine from GAESTEL

76. On July 26, 2023, the UC drove into the Laurelwood Shopping center parking lot around 7:41 PM and observed **GAESTEL** there with a small black and white dog.

77. The UC met with **GAESTEL** in the parking lot. The UC greeted **GAESTEL** and then crouched down to play with **GAESTEL**'s black and white dog.

78. **GAESTEL** handed the UC a white paper bag which contained a clear Ziploc bag containing orange pills with markings "b 974" and "30," which the UC believed to be fake Adderall pills pressed with methamphetamine.

79. The UC then handed **GAESTEL** the arranged $2,500, and agents observed **GAESTEL** place the $2,500 in his front sweatshirt pocket.

80. **GAESTEL** departed in the white Subaru Forrester around 7:46 PM.

### August 24, 2023: UC Purchases 4,000 Fake Adderall Pills from RICKEY

81. On August 23, 2023, the UC sent a message to the Signal group asking if "4 bs[3]" were available for purchase the following day.

---

[3] When the UC wrote "4 bs," I know from my training and experience that the UC was referencing the quantity of 4,000 Adderall pills.

11

82. On August 23, 2023, Soter responded: "Hi yes they're ready for you".

83. The UC asked where he would pick up the drugs the following day.

84. The Shop responded: "I will likely be passing through your area on Friday for make-up deliveries that don't make it there tonigh" / "Soter will confirm/deny/reschedule for us- but yes, the 4 are still ready for you."

85. The UC requested to meet Thursday in Hayward, California.

86. The Shop responded: "yeah, you would possibly passing by us to get to Hayward as is" / "I'll make a note for @Soter to coordinate with you."

87. Soter then wrote: "Yes we can have someone meet you at Target in EPA Thursday   What time ish?"

88. The UC confirmed the deal for 3:30 PM at the Target store in East Palo Alto, CA.

89. On August 24, 2023, the UC sent a message to the Signal group stating that he would be arriving in East Palo Alto, CA, earlier than expected.

90. Soter wrote: "Ok cool one driver just finished something and can be there early."

91. Around 3:41 PM, the UC drove into the Target parking lot at 1775 E Bayshore Road, East Palo Alto, CA, and observed **RICKEY**'s silver Toyota Matrix.

92. The UC exited his vehicle, entered the front passenger door of the Toyota Matrix, and greeted **RICKEY**.

93. When the UC entered the vehicle, the UC observed **RICKEY** holding a brown paper bag with black markings on it, which contained four clear Ziploc bags containing orange pills with markings "b 974" and "30".

94. **RICKEY** introduced himself as "Rory." **RICKEY** explained that "they" gave him the name "Kairos" for deliveries.

95. **RICKEY** then offered the UC the brown paper bag with black markings containing the fake Adderall pills pressed with methamphetamine, and then placed it in the center console area of the vehicle. **RICKEY** told the UC that things had been hectic because

12

people were ordering a lot for "Burning Man."[4]

96. The UC asked **RICKEY** if he would be driving for the group on a regular basis. **RICKEY** said yes and explained he would be in the area until January.

97. **RICKEY** then asked the UC to check the drugs and proceeded to open the brown paper bag containing the fake Adderall pills.

98. The UC asked **RICKEY** if he had a long delivery route. **RICKEY** said no and explained that he did "smaller routes" and that the "other driver," "F" or "Franz" did longer delivery routes.

99. **RICKEY** said the other driver would drive for hours but that he (**RICKEY**) would drive to the South Bay and nearby.

100. The UC asked how he began working with the group. **RICKEY** said he knew the right people. **RICKEY** said that the group was practicing a form of harm prevention and explained how they had friends who overdosed.

101. Around 4:08 PM, the UC exited **RICKEY**'s vehicle and returned to the UC vehicle to try to send Bitcoin to a cryptocurrency wallet for the 4,000 fake Adderall pills.

102. The UC returned to **RICKEY**'s vehicle and told **RICKEY** the UC could not get the cryptocurrency payment to work.

103. **RICKEY** then said he would call "them" and called Soter on speakerphone through a Signal audio call.

104. The UC then spoke to Soter directly.

105. The UC said that he needed to send the Bitcoin from a desktop computer.

106. Soter then sent a Signal message with a cryptocurrency wallet address.

107. **RICKEY** asked Soter what to do if the cryptocurrency transfer did not work. Soter asked the UC whether, if the transfer on the UC's desktop did not work, the UC would be able to meet up for a cash payment. The UC agreed.

---

[4] Burning Man is an event held annually in the western United States. It is known—among other things—for prevalent drug use.

108.    Soter told the UC if it did not work, they could figure out cash payment in the next few days. The UC told them the transfer was not working.

109.    Soter then said it was okay for the UC to take the Adderall pills and send the cryptocurrency once the UC got home.

110.    The UC confirmed with **RICKEY** that the UC would take the drugs. The UC then exited the vehicle with the pills and departed.

111.    A TruNarc field test of the fake Adderall pills that the UC purchased from **RICKEY** showed a presumptive positive test result for methamphetamine.

## CONCLUSION

112.    Based on the information set forth in this Affidavit, I respectfully submit that there is probable cause to believe that **Matthew SESTAK**, **Frederick GAESTEL**, and **Rory RICKEY** distributed methamphetamine in the Northern District of California in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). I respectfully request that the Court issue complaints and arrest warrants for **Matthew SESTAK**, **Frederick GAESTEL**, and **Rory RICKEY**.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

                                                    /s/
                                                COLIN HART
                                                Special Agent
                                                Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P 4.1 and 4(d) on this 12th day of September 2023.

HON. PETER H. KANG
United States Magistrate Judge